IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 03-CR-56-TCK |
| | ) | |
| ALFREDO HERRERA, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

The Court conducted a non-jury trial of this matter on October 31, November 2, and November 3, 2005. Federal Rule of Criminal Procedure 23(c) provides as follows: "In a case tried without a jury, the court must find the defendant guilty or not guilty. If a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion." Defendant did not make such a request, and the Court is therefore not required to articulate its findings. *See United States v. Powell*, 973 F.2d 885, 889 (10th Cir. 1992) (explaining that Rule 23(c) conditions the specific findings on the party's articulated desire to have them). Nonetheless, the Court finds it appropriate to issue a written decision due to the complex nature of this case. After reviewing all documentary and physical evidence and observing all witnesses to determine the credibility of each, the Court enters the following findings pursuant to Federal Rule of Criminal Procedure 23(c).[1]

---

[1] Because Defendant is in custody awaiting this Court's verdict, the Court made an effort to issue these findings in a timely manner. The findings therefore do not include citations to a completed transcript or extensive citations to exhibits.

1

I.        **Procedural History**

On April 16, 2003, Alfredo Herrera ("Defendant"), Roberto Herrera ("Roberto"), and David Romero ("Romero") were charged by Indictment with conspiracy to possess marijuana, in violation of 21 U.S.C. § 846 (Count 1), and conspiracy to import marijuana, in violation of 21 U.S.C. § 963 (Count 2).  The United States also sought civil forfeiture of certain proceeds traceable to the drug charges (Count 3).

On October 15, 2003, the United States filed a Superseding Indictment, naming two additional Defendants, Esteban Herrera ("Esteban") and Lorena Miranda ("Miranda").  The United States added Esteban as a Defendant to Counts I and II, such that Roberto, Esteban, Defendant, and Romero were all alleged as co-conspirators to possess and import marijuana.  The United States also added the following counts:  one count of possession of marijuana with intent to distribute, in violation of 21 U.S.C. §841(a)(1), against Roberto, Defendant, and Romero (Count 3); one count of conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h), against all five Defendants (Count 4); sixty-two (62) counts of structuring financial transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(a)(3), against all five Defendants (Counts 5-66); three civil forfeiture counts against all five Defendants (Counts 67-69); and one count of conspiring to structure financial transactions to evade reporting requirements, in violation of 18 U.S.C. § 371, against all five Defendants (Count 70).

Approximately nine months after the first Indictment, the police executed the arrest warrant for Defendant on July 13, 2004.  The police executed a search warrant of Defendant's home and found no drugs, cash, guns, or other evidence that was presented in the trial of this case.  Defendant has been in custody since July 13, 2004.

2

On October 27, 2004, Miranda pled guilty to Count 70, conspiracy to structure financial transactions to evade reporting requirements.  On December 3, 2004, Romero pled guilty to Count 1, conspiracy to possess marijuana with intent to distribute, and Count 70, conspiracy to structure financial transactions to evade reporting requirements.  Miranda and Romero have not yet been sentenced.

On December 13, 2004, the United States filed a Third Superseding Indictment, which governed the trial of this case.  The Third Superseding Indictment contains the same seventy (70) counts in the Superseding Indictment, but names only Roberto Herrera and Alfredo Herrera as Defendants.  All charges against Esteban Herrera were dropped.  Roberto Herrera resides in Mexico and has never been arrested.  Thus, at the time of filing the Third Superseding Indictment, Alfredo Herrera was the only Defendant to be tried in the case.

On April 18, 2005, the United States filed an Information alleging one count of maintaining a location to distribute a controlled substances, in violation of 21 U.S.C. § 856, against Defendant.

On April 29, 2005, Defendant attempted to enter a plea of guilty to Count 70, conspiring to structure financial transactions, and to the Information, maintaining a location to distribute a controlled substance.  Then-presiding Judge Dale Cook did not accept Defendant's plea of guilty to Count 70 and therefore rejected the entire plea agreement.  On September 12, 2005, Defendant attempted to enter a plea of guilty to Count 60, one instance of structuring a financial transaction to evade reporting requirements.  During the change of plea hearing, the United States stipulated that, if the Court were to accept Defendant's plea, Defendant would be subject to five-year maximum

penalty.[2]  Again, Judge Cook rejected Defendant's plea.

Judge Cook rejected Defendant's attempts to plead guilty to Count 70 and to Count 60 because, when questioned, Defendant refused to admit that his intent in structuring certain financial transactions in amounts less than $10,000 was to evade the reporting requirements.  Defendant maintained at the plea hearings, as he did throughout the trial, that he had another purpose for making the cash deposits in amounts just less than $10,000.  The matter was set for trial on all counts alleged in the Superseding Indictment for October 31, 2005.

On October 28, 2005, this case was reassigned to the undersigned judicial officer.  Previously, on September 27, 2005, Defendant had filed a Waiver of Jury Trial and Joint Request for Non-Jury Trial.  In open court before the beginning of this trial, the Court confirmed Defendant's desire to waive his right to jury trial, and Defendant executed a written waiver.  (*See* Docket No. 194.)

During the course of the trial, the United States confirmed that it was not trying Defendant on the Information filed April 18, 2005 and that such Information would be dismissed.  The United States also confirmed that it was trying Defendant on Count 70, despite the United States' failure to discuss Count 70 in the summary of charges in its trial brief.  The parties also confirmed that Count 2 of the Third Superseding Indictment (hereinafter the "Indictment") charged Defendant with *conspiracy* to import marijuana, although the Indictment references only 21 U.S.C. § 952, which criminalizes the substantive offense.

---

[2]  Thus, Defendant did not attempt to enter a plea to an "aggravated" case of structuring pursuant to 31 U.S.C. § 5324(d)(2), which requires proof that the structuring occurred as part of a pattern of illegal activity involving more than $100,000 in a twelve-month period and which carries a ten-year maximum penalty.

II.      **Rule 29(a) Motion**

At the close of all evidence, Defendant moved for a Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(a), which the Court took under advisement. The Court finds that the United States has submitted sufficient evidence to sustain a conviction as to all Counts and finds instead that the determination of guilt or innocence as to all Counts turns on determinations of the credibility of witnesses, the drawing of or failing to draw certain inferences, and careful scrutiny of the documentary evidence by the trier of fact. The Court therefore DENIES Defendant's oral Motion for a Judgment of Acquittal.

III.     **Background and General Findings of Fact**

A.      People and Businesses Involved

Defendant Alfredo Herrera is a 61-year old Mexican-American who was born in Mexico and who has resided in the Tulsa, Oklahoma area since 1968. Defendant started working in Tulsa as a janitor at a Kentucky Fried Chicken ("KFC") restaurant. Since that time, he has owned eight KFC franchises, six of his own Mexican restaurants which are known as "Alfredo's", and two check-cashing businesses, all in the Tulsa area. Several character witnesses testified that Defendant has been an involved member of the Tulsa community and has employed several people in this community for the past twenty years. Defendant became an American citizen in 1992 and has no criminal history. Prior to being detained, Defendant traveled to Mexico regularly to see his family and sometimes saw his brother Roberto.

In 1991, Defendant sold his KFC franchises but testified that he was never properly paid for these sales and lost several thousands of dollars. Defendant opened his first check-cashing business around 1997, which was referred to during trial as Casa Herrera 1 ("CH1"). In addition to cashing

checks, CH1 performed wire transfers, paid utility bills, and sold phone cards.  CH1 was also a convenience store that sold some groceries and other goods, but its primary business was financial transactions.  Defendant opened his second cash-checking business around 2002, which was referred to during trial as Casa Herrera 2 ("CH2").  CH2 was located approximately two miles from CH1.  CH2 performed similar financial transactions as CH1 but did not sell any goods.  Both businesses have closed since Defendant has been in custody.

CH1 and CH2 were located in an area of Tulsa that is heavily populated by Mexican-Americans.  Many customers of CH1 and CH2 did not have bank accounts but instead cashed their paychecks at businesses such as CH1 and CH2.  It was also common for members of this community to make wire transfers of money to relatives in Mexico.  It is undisputed that CH1 and CH2 conducted hundreds of thousands of dollars of legitimate business transactions during the relevant time period.  For example, a summary chart prepared by Special Agent Robert Taylor purports to show that, in approximately one month's time (September 2002), CH1 and CH2 had approximately $933,269.64 in legitimate receipts.  (*See* Ex. 49.)  Defendant testified that, when CH1 was thriving and had many customers, it cashed as many as 1300 checks and transacted as much as $419,000 in a single business day.[3]  Therefore, although there are large amounts of money involved in this case, it is undisputed that large numbers of financial transactions, at least of some of which were legitimate, were conducted at CH1 and CH2.

Roberto Herrera, the other Defendant charged in the Indictment, is Defendant's brother who resides in Mexico.  Roberto is associated with a tile company in Mexico known as Comercial

---

[3] Since that time, Defendant testified that his businesses suffered after a competing check-cashing business, Neighborhood Financial Services, was opened near his stores and charged a lower check-cashing fee.

Tarahumara. As explained above, Roberto has not been apprehended. Esteban Herrera, who is no longer charged as a defendant in this case, is Defendant's brother who resides in the Tulsa area. Hector Herrera, who has never been a Defendant in this case, is another of Defendant's brothers who resides in the Tulsa area. David Antonio Romero is Defendant's 33-year old nephew, the son of Defendant's sister who resides in Mexico. David Romero is also referred to as "Tony." Romero has lived in Tulsa for five years. Romero was employed by Defendant to operate CH2 and was paid $500 per week. Lorena Miranda was Defendant's mistress, with whom he had a relationship from approximately 1991 to 2003.

> B.    Marijuana Bust on October 23, 2001[4]

In late October 2001, the Drug Enforcement Agency ("DEA") was contacted by a trucking company, Roadway Express, Inc. ("Roadway"). Roadway informed the DEA that it had been hired to deliver a shipment of ceramic tile from Mexico to an address in Broken Arrow, Oklahoma that was not suitable for delivery. According to the Roadway receipt, the tile was shipped from Comercial Tarahumara in Chihuahua, Mexico to a "Marler Enterprises, Inc.," Federal ID No. 73-1514210, at 1933 S. Elm in Broken Arrow, Oklahoma. This address is a building that used to house a KFC franchise owned by Kelly Marler ("Marler"). Defendant owned the building and received rent from Marler prior to Marler's filing bankruptcy and abandoning the business. As of October 2001, the building was abandoned but still contained all business records left behind by Marler. Both Defendant and Romero had access to information containing the address and federal identification number of Marler Enterprises.

---

[4] Although the Indictment alleges that the drug bust took place on October 21, 2001, the evidence at trial confirmed that the drug bust actually took place on October 23, 2001.

After learning that the tile shipment would be picked up at the Roadway location in Tulsa, the DEA began surveillance. On October 23, 2001, a Penske rental truck arrived at the Roadway location. Jenaro Chavez ("Chavez") had rented this first truck from Penske and, when he arrived at Roadway, signed for the tile. (*See* Ex. 27.)[5] A portion of the tile was loaded into the truck by Chavez and other workers hired by Romero; however, all of the tile did not fit into one truck. The first Penske truck then left Roadway and arrived at a Wal-Mart parking lot. Romero was present at Wal-Mart, driving a Chevrolet Yukon. From Wal-Mart, the Yukon, driven by Romero, and the Penske truck, driven by workers, went to Penske to rent a second truck. Romero signed for this truck. (*See* Ex. 27.) From Penske, the Yukon and the two Penske trucks followed each other back to Roadway to finish loading the boxes of tile.

Officer Matt Mayfield testified that he first saw a black 1990 Lincoln Town Car, Defendant's car, at Roadway, after the second Penske truck and Yukon arrived. Officer Mayfield also testified that, once loaded, the two Penske trucks left Roadway together, followed by the Yukon driven by Romero and the Lincoln driven by Defendant. From here, all the vehicles traveled to a storage facility owned by Defendant and located near one of Defendant's Mexican restaurants. Romero testified that Defendant was present at Wal-Mart. Defendant denied being present at Penske, Roadway, or Wal-Mart but admitted being present at the storage facility and helping unload the tile. Defendant stated that he was also in the vicinity of the subject Wal-Mart on that day washing his car.

During the unloading of the tile, DEA officers entered the scene, opened the boxes, checked the tile for marijuana, and made arrests. The top and bottom pieces of ceramic tile were intact, but the middle pieces of tile had been hollowed out and bricks of carbon-wrapped marijuana were hidden

---

[5] Chavez, nor any other workers hired to help unload the tile, testified at trial.

8

inside.  Romero left to run an errand prior to the bust but arrived back at the scene shortly after DEA appeared.  Defendant, Romero, and the other workers were arrested and taken in for questioning. After being Mirandized, Defendant spoke with Officer Eric Katz and denied having knowledge that marijuana was hidden in the tile. Defendant was released that day.  Defendant was not charged with any crime related to the October 23, 2001 drug bust until the first indictment filed in this case two years later on October 15, 2003.

Immediately after his arrest in October 2001, Romero began cooperating with the DEA. Romero assisted the DEA in intercepting several faxes sent to Romero at CH2 from Mexico by Roberto, who apparently was not informed by anyone, including Defendant, that a drug bust had occurred on October 23, 2001.  Romero assisted agents in setting up purchases of the marijuana seized by the DEA in October 2001 and then making arrests of the buyers.  Defendant was aware of Romero's cooperation with the DEA during this time period.

C.      Financial Transactions from August 13, 2001 to November 8, 2002

Robert Taylor, a supervisory special agent with the IRS ("Agent Taylor"), scrutinized Defendant's financial transactions taking place from August 2001 to November 2002.  Specifically, Agent Taylor focused on suspicious activity related to Account Number 307378 at Rogers County Bank ("the RCB Account"), the business operating account of CH1 and CH2.

It is undisputed by Defendant that Defendant, Romero, and Miranda engaged in a fraudulent check scheme whereby Defendant directed Romero and Miranda to open several separate bank accounts in their own names at different banks around town (the "Romero/Miranda Accounts"). Romero and Miranda would sign blank checks from the Romero/Miranda Accounts.  Romero, Defendant, or Defendant's secretary, Lisa DeLagarza ("DeLagarza"), would then fill in fictitious

9

payees and amounts on the signed checks. Defendant typically filled in the amounts of the checks. Defendant and others would then deposit and/or cash the false checks in the RCB Account as if the checks were being cashed by legitimate customers of CH1 or CH2. Defendant's testimony is that he would then use these checks to get instant cash or credit from RCB for these checks. Before the false checks cleared the Romero/Miranda Accounts, Defendant would cause to be deposited - in the account upon which the checks were drawn - enough cash to cover the false checks written a few days prior. The amounts of deposits were typically the same or just slightly more than the amounts withdrawn. Agent Taylor totaled approximately $1,880,910.00 worth of fraudulent checks deposited into the RCB Account over a fifteen-month period. Of this $1,880,910.00 in fraudulent checks, Special Agent Taylor totaled $1,687,068.16 of the covering cash deposits to the Romero/Miranda Accounts that were made in "structured" amounts of less than $10,000.

The above scheme, combined with the assertion that Defendant desired to conceal illegal proceeds, forms the basis of Count 4, conspiracy to launder monetary instruments. The overt acts alleged in furtherance of the money laundering checks are 291 instances of deposits of fraudulent checks into the RCB Account and subsequent cash deposits into the Romero/Miranda Accounts. This scheme also forms the basis of Counts 5-66 and 70, structuring financial transactions to evade reporting requirements and conspiring to structure transactions to evade reporting requirements. Counts 5-66 represent cash deposits into the Romero/Miranda Accounts made on one particular day in amounts exceeding $10,000, but in individual amounts less than $10,000.

10

IV.     **Verdicts and Specific Findings of Fact**

   A.      Count 1 - Conspiracy to Possess 1000 Kilograms or More of Marijuana With Intent
           to Distribute - 21 U.S.C. §846

The elements of conspiracy to violate the federal drug laws are as follows: (1) two or more

persons agreed to violate the federal drug laws; (2) the defendant knew the essential objective of the

conspiracy; (3) the defendant knowingly and voluntarily became part of the conspiracy; and (4) there

was interdependence among the co-conspirators, meaning the members in some way or manner

intended to act together for their shared mutual benefit.  *See United States v. Scull*, 321 F.3d 1270,

1282 (10th Cir. 2003); Tenth Circuit Criminal Pattern Jury Instruction (hereinafter "10th Cir. Crim.

Inst.") 2.87.  The United States may prove a drug conspiracy entirely with circumstantial evidence.

*See United States v. Mendoza-Salgado*, 864 F.2d 993, 1006 (10th Cir. 1992); 10th Cir. Crim. Ins.

2.87.  Although a trier of fact may draw reasonable inferences from the evidence, "an inference must

be more than speculation and conjecture to be reasonable, and caution must be taken that the

conviction not be obtained by piling inference on inference."  *United States v. Arras*, 373 F.3d 1071,

1073 (10th Cir. 2004).

The  objects of the alleged conspiracy in this case are to possess and distribute marijuana, to

invest proceeds of  marijuana sales, to maintain drug premises to store marijuana, and to use

communication facilities to facilitate distribution of marijuana.  The overt acts alleged in the

Indictment to have been committed by Defendant in furtherance of the conspiracy consist of the

following:  (1) October 17, 2001 - keeping and maintaining coded tally sheets involving the receipt

of proceeds from the distribution of marijuana;[6] (2) October 21, 2001 - appropriating information

_____

   [6]  There was no testimony or documentary evidence presented of a "tally sheet."

to be used to identify the shipment location to Marler Enterprises; (3) October 21, 2001 - meeting with others to coordinate the movement of the marijuana shipment; (4) October 21,2001 - driving vehicles to facilitate and monitor the delivery of the marijuana; (5) October 21, 2001 - providing access to the storage facility for the off loading of the marijuana; (6) August 2001-October 2002 - arranging for collection of money generated from the sale of marijuana; (7) investing the proceeds of the unlawful distribution into various businesses; and (8) all other acts alleged in other counts of the Indictment.   The United States need not allege or prove the commission of an overt act in furtherance of a drug conspiracy in order to meet its burden of proof.  *United States v. Shabani*, 513 U.S. 12, 15 (1994); 10th Cir. Crim. Inst. 287.

The Court finds that a drug shipment of approximately 1100 pounds of marijuana arrived in Tulsa from Mexico on or around October 23, 2001, which was to be distributed.  This drug shipment involved coordination between a conspirator in Mexico and a co-conspirator or co-conspirators in Tulsa.  Based on the evidence presented surrounding the shipment of the marijuana, the "sales" of the marijuana set up after the interdiction of the marijuana by the DEA, and the fax communications between Roberto and Romero regarding the shipment of marijuana, the Court finds that a drug conspiracy existed.  The crucial determination in this case is whether the United States has proven beyond a reasonable doubt that Defendant was a member of the conspiracy, that is, whether Defendant knew the essential objects of the drug conspiracy and knowingly and voluntarily became part of the conspiracy.  In making this determination, the Court must consider only Defendant's acts and statements; a Defendant cannot be bound by the acts or declarations of other participants until it is established that a conspiracy existed and that Defendant was one of its members.  *See* 10th Cir. Crim. Inst. 287.

*Defendant's Explanation for Being Present at the Drug Bust*

Defendant testified as follows regarding the October 2001 tile/marijuana shipment: Romero told Defendant about the shipment of tile six to eight weeks prior to its arrival. Romero told Defendant he had the opportunity to make seventy to eighty cents on each piece of tile and that he needed a place to store the tile for a few days. Defendant agreed to allow Romero to store tile at the abandoned KFC location in Broken Arrow. Two days before the shipment arrived, Romero told Defendant there was a problem with that delivery address, and Defendant agreed to allow Romero to store the tile in a facility owned by Defendant near one of his Alfredo's restaurants. On the morning of October 23, 2001, Defendant met Romero and gave him the key to the storage facility Defendant owned. That night, around 6:00pm, Defendant arrived at the storage facility, where five to six workers were already unloading the tile. Defendant helped them unload the tile. Defendant learned for the first time that the tile contained marijuana when the police removed the marijuana from the tile. Defendant denied being present in the Wal-Mart parking lot or when the trucks were rented. Defendant denied that he has ever sold drugs, taken drugs, or earned money by selling drugs.[7]

Miranda, Defendant's mistress for over ten years, testified for the United States. She stated that, on October 23, 2001, Defendant told her he was helping Romero unload some tile. She also testified that Defendant told her, after being arrested and released in October 2001, that "Mr. Romero had got him [Defendant] in trouble." Miranda's testimony in this regard was consistent with Defendant's explanation for being present at the drug bust.

---

[7] Defendant admitted wrongdoing with respect to the fraudulent check writing but maintained he never intended to steal or cheat the bank out of any money.

*Romero's Implication of Defendant in Drug Conspiracy*

Romero testified that, sometime before October 2001, Defendant was desperate for money and that Defendant went to Mexico to coordinate the tile/marijuana shipment with Roberto. Romero testified that Defendant directed and controlled Romero's activities with respect to the October 2001 drug shipment, including Romero's rental of the trucks and hiring of the workers to unload the tile. Romero further testified that Defendant was present at various times on October 23, 2001, in order to supervise and oversee the marijuana shipment.

*The Faxes*

There are sixteen faxes in the record exchanged between Roberto and Romero between October 23, 2001 and November 20, 2001, according to the "received" dates listed on the United States' exhibit list.[8] Of the messages contained in the sixteen faxes, the Unites States points to two references by Roberto to an "uncle." Exhibit 18 reads as follows: "Nephew: I'm very displeased = because only you know what's up = it's not like *you or your uncle* can call me from a public phone I'll wait for your fax as soon as possible Thank you Sincerely, uncle." Exhibit 25 reads as follows: "Tony: I have a big problem for my father. I need you to send me the 10,000 to hire an attorney. It's imperative that you talk to your friend of the details of what happened they don't believe me that 3

---

[8] The dates of the faxes are a puzzling aspect of this case. The dates imprinted on the faxes do not match the alleged "received" dates on the United States' exhibit list. There was testimony at trial that the fax machine at CH2 showed the wrong year and that the faxes were actually exchanged in 2001. This appears to be true based on the undisputed dates of the marijuana shipment discussed in the faxes. But this does not explain why the month and day imprinted on the faxes do not match the received dates alleged by the United States on their exhibit list. For an example of confusion regarding the dates of the faxes, one of the faxes is imprinted with a fax date of October 24, 2000, and is alleged to have been received at CH2 on November 20, 2001 (*See* Ex. 26.) To further complicate the issue, the fax is dated by Roberto as November 2, 2001. These issues were not resolved at trial.

14

different accidents could be possible. I'll wait here for your response. confirm me that what happened on the floor *only you and uncle* saw." The United States did not offer much evidence or explanation to connect these uses of "uncle" to Defendant, except Romero's assertion that the statement referred to Defendant. Instead, the Court must determine if the surrounding circumstances are such that the Court can draw the inference that Roberto is referring to Defendant, and that Defendant was therefore a knowing member of the drug conspiracy.

*The Financial Transactions*

The United States also presented evidence of the financial transactions described above in Part III.C as evidence of Defendant's involvement with the drug conspiracy. The charges are related in that the United States relies on the financial evidence to bolster the drug conspiracy charge and the drug evidence to bolster the money laundering conspiracy/structuring charges. The Court has considered the totality of the evidence with respect to each charge.

*Summary of Court's Assessment of Evidence*

The Court finds that the United States has not met its burden of proving Defendant's knowing and voluntary involvement in the alleged drug conspiracy beyond a reasonable doubt for the following reasons. First, after assessing Romero's demeanor on the stand and his answers, which offered very little detail or elaboration on Defendant's involvement with the conspiracy, the Court finds Romero's testimony to be unreliable and unworthy of substantial weight. The evidence connecting Romero to the October 23, 2001 drug bust was overwhelming, particularly the faxes from Roberto to Romero surrounding the shipment. Romero had very little chance of escaping conviction on Counts 1-3 and had every incentive to cooperate with the United States to receive a reduced charge. More importantly, Romero's overall demeanor, hostility, and failure to offer particularized

information regarding the role of Defendant in the conspiracy did not lend credence to his testimony regarding Defendant's role.

In addition, Romero's testimony that Defendant controlled and directed him regarding the October 2001 shipment is inconsistent with Roberto's exclusive communications with Romero. The faxes from Roberto were sent only to Romero and were sent to CH2, the store operated by Romero. Romero testified that he was usually the only employee in the store. The Court has considered the United States' evidence of "compartmentalization," which is a method of shielding members of the conspiracy. However, the United States failed to present corroborating evidence that Defendant ever discussed the shipment or other shipments with Romero or Roberto during the October 2001 time frame or during the lengthy period of time after Romero began cooperating with police and before Defendant's arrest in July of 2004. If Defendant was suspected of being the financier of a large drug ring, law enforcement were likely closely observing the movements and discussions of Defendant with Roberto and/or Romero.  Yet, the United States offers only the testimony of Romero and circumstantial evidence regarding Defendant's involvement with one drug shipment that took place four years ago to connect Defendant to the alleged drug conspiracy in this case.

Second, the Court finds that Defendant's proffered explanations for being present at the unloading of the tile, coupled with the inferences that can be drawn from the significant lapse of time between the October 2001 drug bust and the charges in this case and the lack of any persuasive connection to drug activity during this time, are sufficient to create a reasonable doubt regarding whether Defendant was a member of the drug conspiracy alleged in the Indictment. The Court has considered certain inconsistencies between Defendant's testimony and the officer's testimony regarding his presence at Wal-Mart, Roadway, or Penske on the day of the bust and does have

16

concerns about these inconsistencies. However, Defendant does not bear the burden of proof, and the Court finds the totality of the evidence does not support a finding of Defendant's knowledge of the marijuana in the tile beyond a reasonable doubt.

Third, the Court finds the faxes to be unclear and inconclusive of Defendant's involvement. Nearly all the faxes are specifically addressed to "Sobrino", or nephew, and there is no evidence that Defendant saw, received, or sent any of the faxes. With respect to the "uncle" references, Romero has three uncles in Tulsa, two of which were charged with the drug conspiracy alleged in this case. In Exhibit 18, which contains a reference to "uncle" being able to call him, Roberto also states that "only you [Romero] knows what's up," indicating that "uncle" may not know what's up. In Exhibit 25, the Court is unsure, reading all sixteen faxes together, to what event "what happened on the floor only you and uncle saw it" is referring. However, in the same message, Roberto instructs Romero to talk to his [Romero's] friend and convince him of something. He also asks Romero for money to hire an attorney. Even considering the United States' evidence regarding "compartmentalization" of certain members of a drug conspiracy, the Court finds it implausible that Roberto would ask Romero, instead of his brother (the other alleged "leader" of the drug organization) for assurances that he was not being busted and for money to hire an attorney. Unlike more routine communications regarding shipping information, buyers, or quantities which would be screened from drug leaders, these communications become more desperate and are seeking verifications of loyalty from Romero. There is no evidence that Roberto contacted Defendant for the same assurances, despite Roberto's obvious suspicions.

After the arrest of Romero, the DEA began intercepting the faxes and causing Romero to send return faxes to continue to coordinate sale of the marijuana contained in the October 2001

shipment. These sales and the cooperation of Romero led to arrests of marijuana buyers. Although the DEA closely monitored these communications and sales activities following the October 2001 shipment, the United States presented no evidence of Defendant's involvement with Roberto or Romero regarding these sales. Further, it is clear Defendant did not alert or cause Roberto to be alerted to cease sending faxes to coordinate sale of that shipment after it was seized by the police. It seems an alleged financier of a drug ring would find a way to alert his brother/supplier in Mexico that they had been discovered and to cease all faxes regarding sale of the drugs in that shipment.

In light of the overall circumstances surrounding the faxes, which are that they were sent to Romero at CH2, that there is no evidence that Defendant saw, received, or ever knew about the faxes, and that the faxes continued to be sent after the drug bust, the Court finds the two references to "uncle" among a group of sixteen faxes to be inconclusive at best.

Fourth, while the Court has carefully considered the financial evidence and the inferences that can be drawn therefrom in connection with the evidence surrounding the marijuana bust in October 2001, the Court finds that the United States has not shown beyond a reasonable doubt that Defendant conspired to commit the crimes of money laundering or structuring. This is explained in more detail below in Part IV.D. The Court has considered the financial evidence in relation to the drug conspiracy charges but does not find that it can fill the gap in the United States' otherwise deficient evidence regarding Defendant's involvement in the drug conspiracy.

Finally, the Court finds Defendant's lack of criminal history, ties to the community, and demeanor on the stand further create a reasonable doubt as to whether Romero acted alone as the co-conspirator of Roberto in coordinating the tile shipment from Mexico. Romero frequently traveled to Mexico. Romero rented the Penske trucks, received the faxes, hired the workers, and had access

18

to all information provided on the Roadway ticket.  Romero received the faxes and was asked to cooperate after the bust (presumably to help bust Roberto, the supplier).  Although the Court is mindful that a drug conspiracy can be shown by circumstantial evidence alone and the inferences that can be drawn therefrom, the Court finds that the United States has simply not shown Defendant's knowledge and participation in the drug conspiracy beyond a reasonable doubt.

The Court finds Defendant **NOT GUILTY** of Count 1.

B.    Count 2  - Conspiracy to Import 1000 Kilograms or More of Marijuana - 21 U.S.C. §§ 952, 963[9]

The elements of conspiracy to import a controlled substance into the United States are: (1) two or more persons agreed to commit the offense of importation of a controlled substance; (2) Defendant knew the essential objective of the conspiracy; (3) Defendant knowingly and voluntarily became part of the conspiracy; and (4) there was interdependence among the co-conspirators, meaning the members in some way or manner intended to act together for their shared mutual benefit.  *See United States v. Arras*, 373 F.3d 1071, 1074 (10th Cir. 2004).  For the same reasons explained above in Part IV.A, the Court finds that the United States has failed to prove beyond a reasonable doubt the second and third elements of the conspiracy.

The Court finds Defendant **NOT GUILTY** of Count 2.

C.    Count 3 - Possession of 500 Kilograms or More of Marijuana with Intent to Distribute - 21 U.S.C. §841(a)(1) and (b)(1)(B)(vii)

The elements of possession with intent to distribute as alleged in the Indictment are as follows: (1) Defendant knowingly or intentionally possessed marijuana; (2) Defendant possessed the

---

[9]  Count 2 of the Indictment references only 21 U.S.C. § 952.  However, consistent with the language of the Indictment, the parties confirmed that Count 2 charged conspiracy to import.

substances with the intent to distribute it; and (3) the weight of the marijuana Defendant possessed

was at least five hundred (500) kilograms as charged. *See* 10th Cir. Jury Inst. 2.85.

For the reasons explained above in Part IV.A, the Court finds the United States has failed

to prove beyond a reasonable doubt that Defendant knew the tile shipment in October 2001, or any

other shipment, contained marijuana or that Defendant intended to distribute the marijuana contained

in the October 2001 shipment, or any other shipment.

The Court finds the Defendant **NOT GUILTY** of Count 3.

D.    <u>Count 4 - Conspiracy to Launder Monetary Instruments</u> - 18 U.S.C. §1956(h)

The elements of conspiracy to launder monetary instruments are as follows: (1) two or more

persons agreed to violate 18 U.S.C. §1956; (2) the defendant knew at least the essential objectives

of the conspiracy; (3) the defendant knowingly and voluntarily became part of the conspiracy; and

(4) there was interdependence among the co-conspirators, meaning the members in some way or

manner intended to act together for their shared mutual benefit.[10]   To obtain a conviction for

conspiracy to violate 18 U.S.C. §1956, the United States must prove that the defendant "knows the

property involved in a financial transaction represents the proceeds of some form of unlawful

---

[10]   18 U.S.C. § 1956(a)(1)(A)(I) and (B)(I) provide, in pertinent part, as follows:

Whoever, knowing that the property involved in a financial transaction represents
the proceeds of some form of unlawful activity, conducts or attempts to conduct
such a financial transaction which in fact involves the proceeds of specified
unlawful activity ... (A)(1) with the intent to promote the carrying on of specified
unlawful activity; or . . .(B) knowing that the transaction is designed in whole or
in part - (I) to conceal or disguise the nature, the location, the source, the
ownership, or the control of the proceeds of specified unlawful activity . . [shall be
guilty of a crime].

activity." *See United States v. Boyd*, 149 F.3d 1062, 1069 (10th Cir. 1998).

Unlike the alleged drug conspiracy, the alleged money laundering conspiracy centers on the actions and activities of Defendant, rather than other co-conspirators. Therefore, if there exists a conspiracy to conduct financial transactions involving proceeds of unlawful activity, Defendant clearly knew the objectives of such conspiracy and voluntarily became a part of such conspiracy. The crucial element as to Count 4 is the first element - whether Defendant conspired with others to conduct financial transactions with known illegal proceeds with the intent to promote the carrying on of specified unlawful activity or for the purpose of concealing the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

*The Alleged Money Laundering Scheme*

The United States alleges that Defendant laundered approximately $1.9 million dollars in illegal drug proceeds through the fraudulent check scheme described in Part II.B. This scheme involved: (1) writing false checks on the Romero/Miranda Accounts, (2) depositing or cashing the false checks through the RCB Account; and (3) depositing cash in the approximate or exact amounts of the false checks a few days later into the Romero/Miranda Accounts. One crucial question raised, for purposes of Count 4, is where did the cash come from that was deposited into the Romero/Miranda Accounts? The United States contends the source of the $1.8 million deposited into the Romero/Miranda Accounts represents unexplained cash and, in light of other circumstantial evidence presented, illegal drug proceeds. Defendant contends the $1.8 million in deposits represents legitimate business transactions of CH1 and CH2 that are merely being cycled through the Romero/Miranda Accounts and then again through the RCB Account in order to provide operating cash for the businesses.

21

*Evidence of Conspiracy to Launder Illegal Proceeds*

Agent Taylor determined, by reviewing deposits into RCB bank, that 291 fraudulent checks were written on the Romero/Miranda Accounts in the total amount of approximately $1.9 million and were deposited into the RCB account from August of 2001 to November of 2002. Agent Taylor testified, utilizing Exhibit 34, that cash deposits made to cover the fraudulent checks written on the Romero/Miranda Accounts constituted unexplained cash and, by inference, illegal drug proceeds being "laundered." Agent Taylor testified that his opinion that this unexplained cash constituted illegal drug proceeds was based on the same evidence described above regarding Defendant's alleged involvement with the October 2001 drug shipment and the January 2002 drug shipment. Agent Taylor infers from Defendant's involvement with these shipments that Defendant received and profited from other drug shipments in this time frame.

Although Agent Taylor has presented detailed evidence of some type of fraudulent check-writing scheme during the 2001-2002 time frame, the United States did not present convincing evidence of shipments, sales, or other drug transactions from which Defendant or any other members of the alleged drug conspiracy profited on or around August 2001 to November 2002. The marijuana shipped in October 2001 was seized by the DEA, and there is no evidence that Defendant earned illegal proceeds from that shipment. There was evidence presented regarding another tile shipment in January 2002 that was identical to the October 2001 shipment; however, this shipment was intercepted by the DEA in El Paso, Texas. There was no evidence presented that this shipment was ultimately destined for Tulsa. Romero testified regarding one trip to Kansas City in the summer of 2001, during which he was allegedly sent by Defendant and Roberto to pick up $15,000 of drug proceeds. Defendant denied any knowledge of this

22

transaction or receiving any money from Romero.  Again, Romero's testimony regarding this

Kansas City trip was scant, lacked particularized detail, and was unreliable.[11]  The United States

alleges that Defendant conspired to launder $1.8 million in drug proceeds during this time frame

but offers the Court little evidence to connect up the alleged unexplained cash with specified

unlawful activity.[12]

The United States presented evidence of a Suspicious Activity Report ("SAR") filed by

Allen Mabry ("Mabry") at RCB regarding the RCB Account.  (Ex. 45.)  The SAR was prepared

on October 5, 2001 and reports suspicious activity from September 19, 2001 to October 4, 2001,

before the October 23, 2001 drug bust.  Mabry testified that he submitted this report due to a high

volume of "Cash In" deposits in larger amounts than had been made in the past into the account,

mostly between $20,000-$50,000.  However, the only evidence of drug transactions in the record

at a point in time prior to October 23, 2001, is Romero's testimony about one $15,000 pick up

from Kansas City he made in the summer of 2001.  Further, the alleged period of money

laundering occurs mostly in 2002.  The United States did not present convincing evidence of how

this SAR relates to the theory of unexplained cash or the money laundering conspiracy allegedly

shown by the fraudulent check scheme.

The United States' theory requires the Court to infer the existence of $1.8 million in

_____

[11]  Even if Romero's testimony is believed, this amount is insignificant compared with the
$1.8 million at issue in the alleged money laundering conspiracy.

[12]  There was no evidence presented of drug transactions occurring before the summer of
2001 from which Defendant earned proceeds.  Therefore, the United States has not proven that
Defendant had previously earned significant drug monies that needed to be laundered through the
fraudulent check scheme.

illegal proceeds, despite the fact the majority of this time period occurs *after* the October 2001 drug bust.  That is, during the undisputed cooperation of Romero, and, presumably, during the close observation of the activities of Defendant (the alleged financier) and Roberto (the alleged supplier),  the co-conspirators were able to successfully traffic and derive significant proceeds from large quantities of marijuana, without providing law enforcement evidence to present during this trial.  The Court finds this to be implausible.

The United States also presented evidence that alleged illegal proceeds were being wire transferred from CH1 or CH2 to Mexico during the relevant time.  The Court was troubled by a reference during the United States' evidence to an approximate $300,000 increase in wire transfers from the stores from September 2001 to October 2001.  However the Court has carefully scrutinized these records.  (Court's Ex. 1.)  The Court finds that the transfers are, for the most part, in small amounts consistent with what a person would send home from their paycheck, that there is no pattern of transfers to the same name or location, and that there is no indication of fictitious names.  Transfers in small amounts would be an expensive and tedious method of getting drug money to Mexico.  Further, any additional amounts of illegal proceeds being wire transferred compounds the United States' problem of a lack of any evidence of actual drug sales or shipments during this time.

*Defendant's Explanation for the Check Scheme*

In this case, Defendant testified and offered the Court an alternative explanation for the check scheme.  According to Defendant, the 291 false checks constituting the overt acts alleged in Count 4 were false checks written to provide Defendant cash flow to operate his businesses.

24

Defendant maintained, and the United States presented no evidence to the contrary, that RCB had a $10,000 limit on instant credit for checks drawn on one particular account (such as the Romero/Miranda Accounts) and that RCB would only provide instant credit on checks in amounts less than $2,500. So if Defendant needed $40,000 cash to run his check-cashing business that day, the only way to get this amount of cash from RCB was to do so in less than $2,500 increments, and never exceeding $10,000 per drawee account (i.e, the account of the deposited check). Therefore, Defendant caused Romero and Miranda to open the different bank accounts and sign the false checks. He then allegedly used the checks to get cash from RCB to obtain the equivalent of a short-term cash loan for that day. He then deposited in cash, within a few days time in every instance, the approximate or precise amount "floated."

The timing and amounts of the financial transactions, at least to some extent, support Defendant's version of events. For example, on Friday, October 25, 2002, the financial evidence shows that Defendant caused to be cashed/deposited at RCB five (5) false checks written on one of the Romero Accounts (the F&M account). These five checks were all in amounts less than $2,500. These five checks totaled $9,815. Thus, on Friday, October 25, 2002, Defendant was able to get $9,815 in instant cash or credit from RCB on the Romero F&M account. The next Monday, October 28, 2002, Defendant caused to be deposited $9,815.00 in the Romero F&M account. Also on October 25, 2002, Defendant caused to be cashed/deposited at RCB five (5) false checks written a different Romero Account (Local Oklahoma account). Again, the five checks were all in amounts less than $2,500. These five checks totaled $9,825.00. Thus, Defendant was able to get $9,825 more in instant cash. Again, the following Monday, Defendant caused $9,825 in cash to be deposited in the Romero Local Oklahoma account. This pattern

repeated itself two more times on October 25, 2002, until Defendant was able to receive just under $40,000 in instant cash from RCB. Consistent with Defendant's version of events, Defendant then had this cash over the weekend to operate his check-cashing businesses.

The next Monday, October 28, 2002, Defendant made or caused cash deposits to be made in the separate Romero/Miranda Accounts in amounts that covered the total checks written from each account, which were in amounts less than $10,000 on each account. Defendant contends there is no "unexplained cash" at all; instead, it is all the same cash being cycled through from one business day to the next in order to ensure cash flow.

*Exhibit 49*

In anticipation of this explanation, which has been consistently offered by Defendant throughout this case (including during both plea colloquies before Judge Cook), Agent Taylor prepared Exhibit 49. This chart represents two "test periods", August 5, 2002-August 15, 2002 and September 9, 2002-September 27, 2002, which were selected by Agent Taylor to show that there was excess cash to operate the businesses. According to this chart and Agent Taylor's description thereof, during the August time frame, legitimate "Casa Herrera Receipts",[13]

---

[13]  Agent Taylor testified that the "Casa Herrera Receipts" column represented legitimate checks that were being cashed aside from checks written on the Romero/Miranda Accounts. When the Court inquired at the conclusion of the evidence whether Exhibit 49 included deposits of money being wire transferred to Mexico, the Court understood counsel for the United States to respond affirmatively. However, the Court is still unclear as to whether or how such amounts are represented on this chart.

combined with legitimate deposits into a clearing account (Account 632901)[14] totaled $648,064.[15]
The "Cash Out" column on the far right, which the Court believes consists of cash withdrawals
made by specific employees such as Defendant and DeLagarza, totaled $507,800.00. According
to Agent Taylor, the Cash Out total of $507,800 represents the amount needed to cover legitimate
checks cashed at the businesses, and the $648,064 represents the legitimate amount of receipts
coming in, resulting in $130,264.00 from an unexplained source. Combined with the other
$179,306.00 which Defendant generated from the fraudulent checks during this time frame,
Agent Taylor testified the unexplained cash for that period totaled $309,264.00.[16]

The Court has spent considerable time analyzing Exhibit 49 and Agent Taylor's
conclusions. However, the Court finds it difficult to reach any meaningful conclusions from this
chart that discredit Defendant's proffered explanation for the check scheme. First, the chart
represents only two short periods of time, selected by the United States for purposes of the
exhibit. During these periods of time, it is notable that the Court was presented no evidence
whatsoever of drug shipments or drug sales that would allow Defendant to come into contact
with illegal proceeds. Second, the Court is simply not persuaded that the chart shows an accurate
picture of the entirety of the business expenses and transactions conducted at CH1 and CH2,

---

[14] Agent Taylor referred to this account as the "2500 account" because all deposits over
$2500.00 had to be made into that account. On the chart, this is labeled as the "Transfer RCB
Acct. 632901."

[15] This amount does not include a deposit in the amount of $65,170.59 on August 13,
2002, that represented proceeds from the sale of a house owned by Defendant.

[16] Exhibit 49 itself does not show these totals and does not show what numbers were
subtracted from others to reach conclusions regarding unexplained cash. All such conclusions
were drawn by Agent Taylor during his testimony. Exhibit 49 standing alone, therefore, is
difficult to interpret for a meaningful conclusion.

such that the chart can demonstrate whether or not Defendant may have needed cash for his business on a daily basis. For example, it seems that if the "receipts" column includes deposits of wire transfers to Mexico during these months but does not include a column showing where that money is wired out of the account, this would artificially inflate the "receipts" column, when compared with the "Cash Out" column.

Third, the fact that "receipts" in the form of legitimate checks were deposited into the RCB Account did not mean Defendant could turn them around into instant cash. It is the Court's understanding from Defendant's testimony that RCB would only give instant credit in amounts less than $2,500 and in no event greater than $10,000 in one day for any drawee account. Thus, the existence of excess cash at the end of a month upon a comparison of cash withdrawals and receipts does not necessarily negate the possibility of a cash-flow problem.

Fourth, the Court has also reviewed Court's Exhibit 4, which is a summary of end-of-month balances in the RCB Account. For the months shown in Exhibit 49, which are August and September 2002, Court's Exhibit 4 shows an end-of-month balance in August 2002 of $2,869.87, and an end-of-month balance in September 2002 of $18,310.56. These are not amounts that show an excess cash flow in relation to a check-cashing business that requires thousands of dollars a day.[17]

Fifth, the United States does not offer evidence of why the checks on the front end were in amounts less than $2500. Could the same money laundering scheme alleged by the United States not have been accomplished with checks on the front end in amounts under $10,000?

---

[17] The United States did not present significant evidence of unexplained wealth of Defendant.

28

Unless Defendant needed cash back or instant credit, it seems these checks could have been in amounts just under $10,000, instead of broken up into the smaller amounts.

In sum, the Court was not provided with an overall understanding of Defendant's businesses - including, for example, profits generated, expenses, an understanding of the nature of any cross-over employees between CH1, CH2, and restaurants owned by Defendant, and whether cash withdrawals from the RCB Account were used exclusively at CH1 and CH2.  The United States had the opportunity to question Romero, who operated CH2, and Defendant, who managed both CH1 and CH2, regarding Exhibit 49 and/or how the businesses worked in general, in a manner that could have painted a picture for the Court of all aspects of the businesses.  This perhaps would have made the United States' overall financial evidence more compelling.  As it stands, a conviction on the conspiracy to commit money laundering would require piling "inference upon inference" regarding the alleged drug sales and the overall nature and operation of Defendant's businesses.

The Court finds, weighing all testimony, the credibility of witnesses, and the financial evidence presented, that the Unites States has failed to meet its burden that Defendant conspired to launder illegal proceeds for the purpose of carrying on criminal activity or for the purpose of concealing the source or nature of the proceeds.  This is due, at least in part, to Defendant's offering of an explanation for the fraudulent check scheme that appears to comport with the evidence presented by the United States.

The Court finds Defendant **NOT GUILTY** of Count 4.

E.      Counts 5-66 - Structuring Financial Transactions to Evade Reporting Requirements and
        Aiding and Abetting - 31 U.S.C. § 5324(a)(3) and 18 U.S.C. § 2

        According to the Tenth Circuit Criminal Pattern Jury Instructions, the elements of

structuring to evade the reporting requirements are as follows: (1) the defendant knowingly

structured a currency transaction; (2) the defendant knew of the domestic financial institution's

obligation to report transactions in excess of $10,000; and (3) the purpose of the structured

transaction was to evade that reporting obligation. *See* 10th Cir. Crim. Ins. 2.96. *But see United

States v. Dashney*, 117 F.3d 1197, 1200 (10th Cir. 1997) (listing slightly different elements and

including term "willfully" as part of required element). Neither party's trial briefs were

particularly helpful to the Court in determining what evidence may establish the "knowingly" and

"intent to evade" elements of the crime. Accordingly, the Court's research is set forth below.

*Statute and Regulations*

        Title 31, section 5324 of the United States Code provides as follows: "No person shall,

for the purpose of evading the reporting requirements of section 5313(a) . . . or any regulation

prescribed under any such section . . . (3) structure or assist in structuring, or attempt to structure

or assist in structuring, any transaction with one or more domestic financial institutions." 31

U.S.C. § 5324(a)(3). The regulations define structuring by reference to both the *actus reus* and

the *mens rea* elements:

        [A] person structures a transaction if that person, acting alone, or in conjunction
        with, or on behalf of, other persons, conducts or attempts to conduct one or more
        transactions in currency, in any amount, at one or more financial institutions, on
        one or more days, in any manner, *for the purpose of evading the reporting
        requirements under section 103.22 of this Part.* "In any manner" includes, but is
        not limited to, the breaking down of a single sum of currency exceeding $10,000
        into smaller sums, including sums at or below $10,000, or the conduct of a

30

transaction, or series of currency transactions, including transactions at or below $10,000.  The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.

31 C.F.R. §103.11(gg) (emphasis added).

*History of Structuring Law*

In 1970, Congress passed the Bank Secrecy Act, which requires, *inter alia*, that domestic financial institutions report to the Internal Revenue Service ("IRS") any cash transactions exceeding $10,000.  *See United States v. MacPherson*, 424 F.2d 183, 188 (2d Cir. 2005) (providing evolution of federal law prohibiting structuring).  Underlying the original legislation was Congress's recognition that reports of large and unusual currency transactions would assist in detecting criminal activity.  *Id.*  No criminal predicate was required to prosecute those who failed to comply with the specified reporting requirements.  *See id.*

Prior to 1986, there was no explicit prohibition on structuring transactions to *avoid* the reporting requirements.  Instead, structuring schemes were typically prosecuted under 18 U.S.C. § 371 as a scheme to defraud the United States.  *Id.*  In 1986, Congress specifically criminalized structuring as part the Money Laundering Control Act.  *Id.*  Originally, in order to be subject to criminal penalties, the United States had to prove that a defendant "willfully" violated the statute. *Id.*; *see also* 31 U.S.C. § 5322 (criminal penalty provision).  Courts differed in their interpretation of this willfulness requirement; however, the United States Supreme Court settled the debate in 1994 by holding that structuring was willful only if the government proved that the defendant acted with knowledge that his conduct was unlawful. *See Ratzlaf v. United States*, 510 U.S. 135,

31

137 (1994).

Following *Ratzlaf*, Congress responded by excepting violations of §5324 from the penalty

provisions of § 5322, which require willfulness, and adding a penalty provision to § 5324 that

does not require knowledge that structuring was illegal. *See MacPherson*, 424 F.2d at 189;

*United States v. Pang*, 362 F.3d 1187, 1193 (9th Cir. 2004); 31 U.S.C. §5324(d) (new penalty

provision). Thus, consistent with the Tenth Circuit Uniform Jury Instructions, the Court finds

that knowledge of illegality is not a required element of structuring. Instead, with respect to

mental state, the United States must prove only that Defendant had knowledge of the reporting

requirements and intended to evade the reporting requirements. *See MacPherson*, 424 F.3d at

189; *Pang*, 362 F.3d at 1193; *United States v. Cassano*, 372 F.3d 868, 878 (7th Cir. 2004).[18]

*Structuring Charges Alleged in this Case*

The same scheme involved in the alleged money laundering conspiracy forms the basis of

the structuring charges. As explained above, this scheme involves: (1) false checks written on

the Romero/Miranda Accounts, (2) deposits or cashing of the false checks through the RCB

Account; and (3) cash deposits in the amounts of the false checks a few days later into the

Romero/Miranda Accounts. The Indictment alleges that approximately $1.6 million has been

structured to evade reporting requirements.[19]

---

[18] In 1997, the Tenth Circuit issued a decision in *United States v. Dashney*, 117 F.3d 1197, 1200 (10th Cir. 1997). This decision implies that knowledge of illegality is still required and that willfulness is an element of the crime. *See id.* However, the decision does not discuss the statutory amendments passed in 1994. Further, the conviction being reviewed appears to have occurred in 1990, prior to the statutory amendments in 1994.

[19] The amount alleged to be structured is slightly less than the amount alleged in the laundering conspiracy because not all deposits of the alleged illegal proceeds were made in

With respect to Counts 5-66, each count represents total deposits made into the various Romero/Miranda Accounts in one day in individual amounts less than $10,000 but together totaling more than $10,000.[20]  For example, Count 60 alleges that, on October 28, 2002, deposits were made into four different Romero/Miranda Accounts totaling $39,119.00.  Such deposits were made in the individual amounts of $9,792.00, $9,687.00, $9,815.00, and $9,825.00.  (*See* Ex. 47 (comprehensive chart demonstrating structuring allegations).)  Thus, instead of making one cash deposit in the amount of $39,119.00 for which a currency transaction report ("CTR") would be filed, Defendant caused Miranda and Romero to make deposits in amounts just less than the $10,000 reporting requirement.

With respect to the first element, there is no question the cash deposits at issue are consistently structured in amounts less than $10,000.   With respect to the second element, Defendant admitted that he knew about the reporting requirements.  In fact, Defendant testified he filled out reports for deposits over $10,000 on a regular basis.  There was also evidence presented that Defendant had been fined for eighteen (18) instances of failing to comply with the reporting requirements. The third element, requiring intent to evade the reporting requirements (i.e., that the purpose of structuring the transactions was to evade the reporting requirements) presents a close question and requires the weighing of the credibility of witnesses and other evidence in the case.

---

amounts evidencing structuring.

[20]  Each of Counts 5-66 is comprised of one or more of the 291 checks listed as "overt acts" in furtherance of the money laundering conspiracy alleged in Count 4.  For example, Count 60 consists of Overt Acts 271-274 alleged in Count 4.

33

The *mens rea* element of intent to evade the reporting requirements can often only be proved through circumstantial evidence and the reasonable inferences drawn therefrom. *See MacPherson*, 424 F.3d at 189. The law draws no distinction between direct and circumstantial evidence in requiring the government to carry its burden of proof. *Id.* at 190. If there exist inferences that are consistent with innocence as well as inferences that are consistent with guilt, it is the task of the finder of fact to choose among the competing inferences. *Id.* (noting that possible innocent explanations for certain events did not preclude a finder of fact from drawing reasonable inference that defendant possessed knowledge of and intent to evade reporting requirements).

In *MacPherson*, the court held that the totality of the circumstantial evidence permitted a jury to reasonably infer the elements of knowledge of and intent to evade the reporting requirements. *Id.* Specifically, the jury could have inferred from the pattern of structured cash transactions themselves and from earlier cash withdrawals that generated CTR filings, that the defendant knew about and intended to evade the requirements. *Id.* (finding that defendant's willingness to sacrifice efficiency and convenience by making 23 deposits in amounts totaling $9,000-$9,200 amply supported finding that defendant knew of and was intent on avoiding reporting requirements). *See generally Cassano*, 372 F.3d at 879 (noting that "it is unlikely, to the point of absurdity, that it was pure coincidence" that defendant would engage in multiple transactions, all under $10,000 to achieve his purpose); *United States v. Gibbons*, 968 F.2d 639, 645 (8th Cir. 1992) (rejecting defense that, although defendant intended to evade the reporting requirements, it was for the purpose of preventing his ex-wife rather than the government from tracing the funds).

This case is unique in that Defendant does not contend the just-less-than $10,000 amounts of the cash deposits are coincidental.  Nor does he contend his motive was to keep the IRS or anyone else from tracing funds through the reporting requirements.  Nor does he deny knowledge of the requirements.  Instead, he contends the amounts of the deposits are the result of a different, although not altogether innocent, purpose of obtaining instant cash from phony checks.  Thus, Defendant's stated "intent" was to get quick cash, and the evasion of the reporting requirements was inconsequential.

As explained in some detail above, the Court finds that the financial records, at least to some extent, corroborate Defendant's explanation.  Using Count 60 as an example, on Friday, October 25, 2002, Defendant caused to be cashed/deposited at RCB five (5) false checks written on one of the Romero Accounts (F&M).  These five checks were all in amounts less than $2,500. These five checks totaled $9,815.  Thus, on Friday, October 25, 2002,  Defendant was able to get $9,815 in instant cash or credit from RCB on the Romero F&M account.  This pattern repeated itself three more times on October 25, 2002, until Defendant was able to receive just under $40,000 in instant cash.  On Monday, October 28, 2005, the "structured" deposits were made in amounts less than $10,000 in each of the Romero/Miranda Accounts.  This pattern of four or five checks in amounts less than $2500, in groups just under $10,000, is a consistent pattern beginning in December 2001 and continuing throughout the relevant time frame.  (*See* Ex. 34A.)

Based on the United States' theory, Defendant acted at all times with the intent to evade the reporting requirements.  That is, the false checks on the front end were the means to the end of depositing illegal cash proceeds in the Romero/Miranda Accounts.  According to the United States, being able to structure the cash deposits in amounts less than $10,000 for the purpose of

35

evading the reporting requirements on the back end drove the small amount of the checks on the front end. This seems to be an unlikely and overly complicated method of "structuring" deposits to avoid reporting requirements. Defendant testified that, in fact, he routinely made deposits into the RCB Account that required CTR filings.[21]

*Other Evidence of Defendant's Intent to Evade*

Miranda testified at trial that Defendant deposited or gave her money to deposit into the phony accounts in amounts less than $10,000 because "they would investigate." Miranda's plea agreement states as follows:

> I, Lorena Miranda, admit that during 2001 and until November 2003 [sic], I agreed to and helped Alfredo Herrera structure transactions to avoid reporting requirements. Alfredo always told me what to do with the checks and always deposited cash into my account to cover them. The checks were negotiated at Casa Herrera. I knew David Romero was doing the same thing for Alfredo Herrera. I knew it was wrong to agree to help him structure the transactions to avoid the reporting requirements.

This statement and Miranda's testimony on the stand evidenced very little understanding of Defendant's motivation for making deposits in amounts less than $10,000. Miranda knew Defendant had instructed her to do something wrong by signing the phony checks, but a statement that "they would investigate" could also mean that RCB would not allow the checks to be cashed.

Romero testified at trial that Defendant gave him the cash to deposit and told him the

---

[21] Exhibit 35 and Exhibit 49 do in fact show dozens of large deposits in the RCB Account. However, other than Defendant's assertion, the parties do not explain if these deposits consisted of cash, checks, or a combination thereof.

deposits should be less than $10,000 to avoid the reporting requirement.  Romero's plea

agreement states in relevant part as follows:

> Also in 2001 and into November 2002, I helped my Uncle Alfredo Herrera
> structured multiple transactions in order to evade the reporting requirements.  **I
> would sign checks and my Uncle would tell me the amounts to fill in, always
> under $10,000.**  My uncle deposited cash into my accounts.  The people the
> checks were written to were fictitious.  The checks were negotiated at Casa
> Herrera.  My Uncle Alfredo Herrera told me what to do.  He controlled the Casa
> Herrera accounts along with my other uncle, Estaban Herrera.  I do not know
> everything they did with the money.  The transactions are included in counts 5-66
> of the indictment.

Romero's statement that Defendant told him to fill in the amounts of the blank checks

under $10,000 is somewhat inconsistent with the financial evidence, which shows the fraudulent

checks were almost always in amounts less than $2500, but never exceeding $10,000 on one

account.

The Court is simply not convinced that Romero and Miranda's testimony or plea

statements support that Defendant acted with the intent to evade the reporting requirements,

rather than the intent to get instant cash from RCB.  Inexplicably, neither Defendant or the

United States questioned Mabry regarding whether Defendant's explanation was actually

consistent with the policy at RCB for business accounts.

With respect to the third element of intent to evade, this is a case where the Court must

weigh the totality of the circumstantial evidence and choose between competing inferences, some

of which indicate an explanation for the fraudulent check scheme whereby the evasion of

reporting requirements is an unintended byproduct, some of which indicate that Defendant did in

fact intend to evade the reporting requirements in an effort to hide the fraudulent check scheme.[22]
The Court finds that Defendant's explanation for the scheme is supported by the financial
evidence.  Further, the United States failed to convince the Court that Exhibit 49 evidenced lack
of financial difficulty, such that Defendant's explanation lacked credence.  The Court further
finds that Romero and Miranda's testimony and guilty pleas are not sufficiently detailed to
evidence Defendant's intent to evade the reporting requirements beyond a reasonable doubt.[23]   In
light of Defendant's reasonable and unequivocal denial of intent to evade the requirements,
which the Court finds to be supported by the evidence, and the lack of supportable inferences that
Defendant's explanation is implausible, the Court finds that the United States has failed to prove
beyond a reasonable doubt that Defendant acted with the intent to evade the reporting
requirements, which is a required element of a structuring charge.

The Court finds Defendant **NOT GUILTY** of Counts 5-66.

F.    Count 70 - Conspiracy to Structure Transactions - 18 U.S.C. §371 and 31 U.S.C.
      §5324(a)(3)

The elements of conspiracy to commit a violation of 31 U.S.C. §5324(a)(3) are as

---

[22]  For the reasons explained in detail above, the Court is not persuaded of the presence of
illegal proceeds.  Thus, the United States' principle theory of Defendant's motive to evade the
reporting requirements - to conceal illegal proceeds - has already been discounted by the Court.
In absence of illegal proceeds, the United States has no real explanation for why Defendant
would go through this effort to evade the requirements, except to conceal the check scheme
which undisputedly involved fictitious payees.

[23]  Juries are instructed to approach testimony of a co-defendant who has entered a plea of
guilty with "caution and [to] weigh it with great care."  *See* 10th Cir. Crim. Ins. 1.15.  Further,
"[t]he fact that an accomplice has entered a plea of guilty to the offense charged is not evidence
of the guilt of any other person."  *Id.*

follows: (1) the defendant agreed with at least one other person to violate the law against structuring transactions with intent to evade reporting requirements; (2) one of the conspirators engaged in at least one overt act furthering the conspiracy's objective; (3) Defendant knew the essential objective of the conspiracy; (4) Defendant knowingly and voluntarily participated; and (5) there was interdependence among the members of the conspiracy. *See* 10th Cir. Crim. Inst. 2.19.

For the reasons explained above in Part IV.E, although the Court finds that Defendant did conspire with Romero and Miranda to conduct some type of fraudulent check scheme, the Court does not find that the United States has proved beyond a reasonable doubt that Defendant conspired to structure financial transactions with the intent to evade the reporting requirements.

The Court finds Defendant **NOT GUILTY** of Count 70.

V.      **Conclusion**

Defendant is hereby found **NOT GUILTY** of all charges.  Based on such finding, the Court need not address Counts 67-69 of the Indictment, which deal with forfeiture of criminal proceeds.  The Court orders the immediate release of Defendant.

ORDERED this *10th* day of November, 2005.

**TERENCE KERN**

**UNITED STATES DISTRICT JUDGE**